IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAWANN R. DIXON, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | Civil Action No. 12-894-GMS |
| | ) | |
| DAVID PIERCE, Warden, and | ) | |
| ATTORNEY GENERAL OF THE | ) | |
| STATE OF DELAWARE, | ) | |
| | ) | |
| Respondents.[1] | ) | |

---

Dawann R. Dixon. *Pro se* petitioner.

Karen V. Sullivan, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for respondents.

---

**MEMORANDUM OPINION**

_____, 2015
Wilmington, Delaware

---

[1] Warden David Pierce replaced former Warden Perry Phelps, an original party to this case. *See* Fed. R. Civ. P. 25(d).

Sleet, District Judge

Pending before the court is an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("petition") filed by petitioner Dawann R. Dixon ("Dixon"). (D.I. 1) The State filed an answer in opposition. (D.I. 19) For the following reasons, the court will deny the petition as time-barred by the one-year limitations period prescribed in 28 U.S.C. § 2244.

I. BACKGROUND[2]

In the early morning hours of March 28, 2008, Kevin Butcher ("Butcher") returned home from work. Shortly after arriving home, Butcher decided to go to the intersection of 24th and Lamotte Streets in Wilmington to speak with friends. At approximately 2 a.m., Butcher saw Dixon in the area. A few moments later, Butcher was shot in the leg.

Instead of going immediately to the hospital, Butcher went home. After awakening his mother, Butcher went with her to the front of the house. Butcher waved down a passing police cruiser, told the officer that he had been shot, and was transported to Wilmington Hospital. Butcher was treated for his injuries and was ultimately released, though the bullet remained lodged in his leg.

Three hours after he arrived at the hospital, Butcher was interviewed by Detective Matthew Hall ("Detective Hall") of the Wilmington Police Department. Detective Hall showed Butcher a six photo line-up containing Dixon's photo. Butcher looked at the photo array for approximately ten seconds and identified Dixon as the man who shot him. Butcher also told Detective Hall "a more pinpoint area" to look for the crime scene. When Detective Hall and his partner went to the 100-block of East 23rd Street, they recovered three spent .25-caliber shell casings.

On April 6, 2008, Wilmington police received a report of a male banging on the front

---

[2]The facts are quoted from *Dixon v. State*, 996 A.2d 1271 (Del. 2010).

door of a house and refusing to leave. Officer Joseph Bucksner ("Officer Bucksner") was dispatched to the home, where he found Dixon standing at the front door of the home. Officer Bucksner ordered Dixon to sit down on the front steps and remove his hand from his pocket. Dixon refused. Officer Bucksner then grabbed Dixon by the arm, forced him to the ground and, with the help of his partner, handcuffed him. During a pat-down search of Dixon, Officer Bucksner found a loaded .25-caliber handgun and a Crown Royal bag containing .25-caliber ammunition. The gun seized from Dixon was ultimately determined to match the shell casings recovered from the scene of the crime.

## *911 Call*

Shortly after the shooting, a 911 dispatcher received a call from an individual who hung up almost immediately after the dispatcher came on the line. In accordance with police department policy, the dispatcher attempted to return the call. After two unsuccessful attempts, the dispatcher was able to reach the caller, a woman later identified as Hacket. The following is the exchange between Hacket and the 911 dispatcher:

DISPATCHER: 911, what is your emergency?

911 CALLER: (Inaudible.)

DISPATCHER: Hello. Hello.

911 CALLER: (Inaudible.) Fucking (Inaudible.)

DISPATCHER: Hello.

911 CALLER: I'm ready to call the mother fucking cops.

(New call, dispatcher calling 911 caller)
(New call, dispatcher calling 911 caller)
(New call, dispatcher calling 911 caller)

2

911 CALLER: Hello.

DISPATCHER: Hello. This is the Wilmington Police. We just received a 911 hangup from this number.

911 CALLER: Yeah, that's right. This is what you want to do. That's a 911 hangup. And go to 24th and Carter. And –

DISPATCHER: What's the problem there?

911 CALLER: It's a problem – a Black male just made a shot. And he has a goatee, looking like – his name is Dawann. He looks like – he looks like the dog called Peetie, whatever the dog – remember the pizza thing? He just shot while I was standing there. And I'm not a snitch and I'm not testifying or nothing. I don't care how you guys check the phone back. I'm just telling you, I'm running from him.

DISPATCHER: He shot someone?

911 CALLER: He didn't shoot anybody. He shot at them. So, get his fucking gunfire off his ass because he's not – he's not Caucasian, so I hope you guys get here. It's not Greenville, it's not Claymont. Okay? and – nor is it Hockessin. So I hope you get here fast enough just to know he still has the powder on his hands. If I was a CSI detective, I would have it off his hands by now. Okay? He has a goatee, and it's really big. It looks like a Sunni, like he's trying to act like he's into (inaudible) to Allah, a Creator. But if he was into the Creator so much, he wouldn't be shooting at people. And when he –

DISPATCHER: What's he wearing?

911 CALLER: All black. Mother fucker. He going to get it now. Bitch. Excuse me my language because I'm so upset.

DISPATCHER: How many shots did he shoot off?

911 CALLER: One, two, three, blah-blah-blah. Bitch. While I was standing there. And, thank God. I'm not –

DISPATCHER: What's your name, ma'am?

911 CALLER: I'm not telling you all that. Please don't –

3

DISPATCHER: Not a problem.

911 CALLER: Guess what? You just have them come to 23rd and Carter and
look for a guy. And, then, guess what else he has in his goatee.
His goatee is very full. It's full like he's looking at a Muslim guy.
And, then, it has gray in it, a stick of gray. And he looks like– and
if you take off his hat, he looks the daggone dog from you know,
the (inaudible) Taco Bell, the Taco Bell dog. He's very light.

DISPATCHER: And is he tall or short?

911 CALLER: No, he's, like, a medium height. Bastard. And I –

DISPATCHER: What about weight?

911 CALLER: I don't know his weight. He's thin.

DISPATCHER: He's thin?

911 CALLER: Yeah. Bastard. Why would he do that? You try and get
information from the phone, I still ain't testifying. I don't care
whatever you do. Because I live here. Okay? I already called you
about this. I'm very upset. I'm outside this time of night because
my sister just got beat up. But at the same time, I can stand here
and be talking whatever time of the night it is. I do work. For him
to do that, it pisses me off.

DISPATCHER: All right. I'll go ahead and get the information and assist and we'll
get an –

911 CALLER: You –

DISPATCHER: --- officer out there. If you – if anything changes give us a call
back.

911 CALLER: No, I'm not, if anything changes because, in the name of Jesus, it
won't change. He – you got the information and you get his ass,
because his name is Dawann. He's been shot before. You get his
ass. Because I'll make sure if I see him again, I'll call you back.
I'm not playing with him.
(Inaudible cross talk.)

911 CALLER: He shot three shots in front of me. Ma'am, I'm standing here to
tell you this.

4

DISPATCHER: I understand. What's his last name again?

911 CALLER: Excuse me?

DISPATCHER: What was the last name? Dawann what?

911 CALLER: On, no. Oh, no. Thank you.

DISPATCHER: All right, thank you.

During Dixon's trial, the State sought to introduce the 911 call into evidence. Dixon objected and argued that the 911 call was inadmissible hearsay because Hacket, the caller, failed to appear at trial. *See Dixon*, 996 A.2d at 1275. The Superior Court held that the content of the 911 call was admissible under the "excited utterance" exception to the hearsay rule. *Id.*

In February 2009, a Delaware Superior Court jury found Dixon guilty of first degree assault, possession of a firearm during the commission of a felony, and possession of a firearm by a person prohibited. *See Dixon*, 996 A.2d at 1273. On June 26, 2009, the Superior Court sentenced Dixon to thirty-eight years of imprisonment, suspended after ten years for a period of probation. *Id.* The Delaware Supreme Court affirmed Dixon's convictions and sentences on May 20, 2010. *Id.* at 1279.

On April 28, 2011, Dixon filed a motion for post-conviction relief pursuant to Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"), and then he filed a *pro se* letter motion to correct an illegal sentence on May 27, 2011. The Superior Court denied both motions on September 30, 2011. *See State v. Dixon*, 2011 WL 7646202 (Del. Super. Ct. Sept. 30, 2011)(Rule 61 motion); (D.I. 16, Exh. 17). Petitioner appealed the denial of the Rule 61 motion, and the Delaware Supreme Court affirmed the Superior Court's judgment March 15, 2012. *See Dixon v. State*, 41 A.3d 429 (Table), 2012 WL 892632 (Del. Mar. 15, 2012).

Dixon filed the instant habeas petition in July 2012. The petition's sole ground for relief asserts that Dixon's Confrontation Clause rights were violated by the admission of the 911 call recording, because Hacket did not testify at trial. The State filed an answer in opposition, alleging that the petition should be denied as time-barred or, alternatively, as meritless. (D.I. 19)

## II. ONE YEAR STATUTE OF LIMITATIONS

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") was signed into law by the President on April 23, 1996, and habeas petitions filed in federal courts after this date must comply with the AEDPA's requirements. *See generally Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA prescribes a one-year period of limitations for the filing of habeas petitions by state prisoners, which begins to run from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Dixon's petition, filed in 2012, is subject to the one-year limitations period contained in § 2244(d)(1). *See Lindh*, 521 U.S. at 336. Dixon does not allege, and the court does not discern, any facts triggering the application of § 2244(d)(1)(B), (C), or (D). Thus, the one-year period of limitations in this case began to run when Dixon's conviction became final under

§ 2244(d)(1)(A).

Pursuant to § 2244(d)(1)(A), if a state prisoner appeals a state court judgment but does not seek certiorari review, the judgment of conviction becomes final upon expiration of the ninety-day time period allowed for seeking certiorari review. *See Kapral v. United States,* 166 F.3d 565, 575, 578 (3d Cir. 1999); *Jones v. Morton,* 195 F.3d 153, 158 (3d Cir. 1999). The ninety-day period for filing a petition for certiorari with the United States Supreme Court runs from the entry of the state court judgment, not from the issuance date of the mandate. *See* Sup. Ct. R. 13(1) & (3).

In this case, the Delaware Supreme Court affirmed Dixon's convictions on May 20, 2010, and he did not file a petition for a writ of certiorari in the United States Supreme Court. As a result, Dixon's convictions became final on August 19, 2010, which means that Dixon had until August 19, 2011 to timely file his petition.

Dixon did not file the instant § 2254 Petition until July 11, 2012,[3] almost eleven full months after the expiration of AEDPA's statute of limitations. Therefore, the petition is time-barred, unless the limitations period can be statutorily or equitably tolled. *See Holland v. Florida,* 560 U.S. 631, 645 (2010)(equitable tolling); 28 U.S.C. § 2244(d)(2)(statutory tolling). The court will discuss each doctrine in turn.

### A. Statutory Tolling

Pursuant to § 2244(d)(2), a properly filed application for state collateral review tolls AEDPA's limitations period during the time the application is pending in the state courts,

---

[3]Pursuant to the prisoner mailbox rule, the court adopts as the filing date July 11, 2012, which is the date Dixon signed the petition. *See Longenette v. Krusing,* 322 F.3d 758, 761 (3d Cir. 2003)(the date on which a prisoner transmitted documents to prison authorities for mailing is to be considered the actual filing date).

7

including any post-conviction appeals, provided that the application is filed during AEDPA's one-year limitations period. *Swartz v. Meyers*, 204 F.3d 417, 424-25 (3d Cir. 2000).

Here, 250 days of AEDPA's limitations period had already expired when Dixon filed his Rule 61 motion on April 28, 2011. The limitations period remained tolled until March 15, 2012, the date on which the Delaware Supreme Court affirmed the Superior Court's denial of the Rule 61 motion. The limitations clock started to run again on March 16, 2012, and ran the remaining 115 days without interruption until the limitations period expired on July 9, 2012. Therefore, the instant petition must be dismissed as time-barred, unless equitable tolling applies.

### B. Equitable Tolling

In very rare circumstances, the one-year limitations period may be tolled for equitable reasons when the petitioner demonstrates "(1) that he has been pursuing his rights diligently, **and** (2) some extraordinary circumstance stood in his way and prevented timely filing." *Holland*, 560 U.S. at 649 (emphasis added). Equitable tolling is not available where the late filing is due to the petitioner's excusable neglect. *Id.*; *Miller v. New Jersey State Dept. of Corr.*, 145 F.3d 616, 618-19 (3d Cir. 1998). Consistent with these principles, the Third Circuit has explained that equitable tolling of AEDPA's limitations period may be appropriate in the following circumstances:

> (1) where the defendant (or the court) actively misled the plaintiff;
> (2) where the plaintiff was in some extraordinary way prevented from asserting his rights; or
> (3) where the plaintiff timely asserted his rights mistakenly in the wrong forum.

*Jones*, 195 F.3d at 159; *Thomas v. Snyder*, 2001 WL 1555239, at *3-4 (D. Del. Nov. 28, 2001).

Dixon does not allege, and the court does not discern, any reason to equitably toll the limitations period. To the extent Dixon's untimely filing was the result of legal ignorance or a

8

miscalculation regarding the one-year filing period, such mistakes do not warrant equitably tolling the limitations period. *See Taylor v. Carroll*, 2004 WL 1151552, at *5-6 (D. Del. May 14, 2004).

Accordingly, the court will dismiss the petition as time-barred.[4]

## III. CERTIFICATE OF APPEALABILITY

When a district court issues a final order denying a § 2254 petition, the court must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In addition, when a federal court denies a habeas petition on procedural grounds without reaching the underlying constitutional claims, the court is not required to issue a certificate of appealability unless the petitioner demonstrates that jurists of reason would find it debatable: (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether the court was correct in its procedural ruling. *Id.*

The court has concluded that Dixon's petition filed pursuant to 28 U.S.C. § 2254 should be denied as time-barred. The court is persuaded that reasonable jurists would not find these conclusions to be debatable. Therefore, the court will not issue a certificate of appealability.

---

[4]Even if the petition was timely filed, the court would deny it for the alternative reason provided by the State, namely, because the Delaware Supreme Court's denial of Dixon's confrontation clause argument was neither contrary to, nor an unreasonable application of, *Crawford v. Washington*, 541 U.S. 36 (2004) and *Davis v. Washington*, 547 U.S. 813 (2006). As in *Davis*, the 911 call statements at issue in this case were non-testimonial because their primary purpose was to provide police officers with basic information to address a present emergency. *See Dixon*, 996 A.2d at 1279 (explaining that the caller's "statements to the 911 dispatcher that described and identified Dixon [were] for the purpose of having him apprehended by the police.").

## IV.  CONCLUSION

For the reasons discussed, the court will deny Dixon's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

An appropriate order will be entered.